**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| WATER TECHNOLOGY, LLC<br>and WATER TECH. CORP.,<br><br>    Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>KOKIDO DEVELOPMENT LIMITED<br>and MENARD, INC.,<br><br>    Defendants/Counterclaim Plaintiffs. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 4:17-cv-01906-AGF |

## MARKMAN ORDER

This matter is before the Court on the parties' cross motions for the construction of certain patent claim terms, pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). For the reasons set forth below, the parties' motions will be granted in part and denied in part.

## BACKGROUND

This patent case is about swimming pool vacuum cleaners. Plaintiffs are Water Technology, LLC and Water Tech. Corp. ("Water Tech"), maker of the Pool Blaster, Catfish, Leaf Vac, and Aqua Broom pool vacuums. Defendants are Kokido Development Limited, maker of Telsa and Vektro pool vacuums, and retailer Menard, Inc. Water Tech filed a complaint asserting that Kokido's products, sold by Menard, infringe five Water Tech patents. Defendants filed a counterclaim seeking declaratory judgment of non-infringement and invalidity. Water Tech dismissed its infringement claims with respect

- 1 -

to two patents. The remaining patents in suit are: (1) U.S. Patent No. 6,939,460, titled Portable Electric Pool Cleaner, issued September 6, 2005 (the '460); (2) U.S. Patent No. 7,636,975, titled Pool Vacuum, issued December 29, 2009 (the '975); and (3) U.S. Design Patent No. D556,396, titled Pool Vacuum, issued November 27, 2007 (the 'D396). Patents '460 and '975 are utility patents for hand-held, battery-powered, submersible pool cleaners. The 'D396 is a design patent for a particular ornamental design for a pool cleaner. Kokido's accused products are also hand-held, battery-powered submersible pool cleaners.

The parties have submitted claim construction briefs and a joint claim construction chart. On November 28, 2018, the Court held a hearing at which the parties presented arguments and Water Tech offered the expert witness testimony of Mr. David Peterson. As discussed below, Defendants seek construction of seven claim terms of the '460 and six terms of the '975. Plaintiffs submit that the Court need only construe three terms in the '460 and two in the '975, leaving the rest to their plain meaning.

## PRINCIPLES OF CLAIM CONSTRUCTION

### Claims Not Requiring Construction

A district court need not construe every claim term challenged by a party. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206–07 (Fed. Cir. 2010). Where the plain and ordinary meaning of the claim term resolves the parties' dispute, a court properly refuses to employ an alternative construction. *Id.* Conversely, "when the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to

resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

"A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* at 1361.  But, if giving the language of the term its plain, ordinary meaning resolves the parties' dispute, a court need not engage in claim construction merely to accommodate one party's semantic preference for the use of a particular word or phrase. *See Id.*  Similarly, a court need not construe a term where the parties do not present a "fundamental dispute" with respect to the meaning of the term, but instead propose the use of different language to achieve greater clarity or precision. *Id.* at 1362.

### Principles Guiding the Construction of Claims

Claim construction is of primary importance in any patent litigation as it "defines the scope of the property right being enforced, and is often the difference between infringement and non-infringement . . . ." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 659 F.3d 1369, 1370 (Fed. Cir. 2011).  As a matter of law, the court is charged with the responsibility for claim construction. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The starting point for any claim construction is the language of the claim. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  Wherever possible, claim terms are given their plain and ordinary meaning as they would have been

understood by one of ordinary skill in the art at the time that the patent issued. *Id.* at 1312–13. In addition, claims are construed "in the context of the entire patent, including the specification." *Retractable Techs, Inc.*, 659 F.3d at 1371.

The specification informs the plain and ordinary meaning of the term. *Id.*; *see also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim."). However, the specification cannot be used to deviate from or to narrow the plain and ordinary meaning of a claim term "unless the inventor acted as his own lexicographer" and clearly set forth a definition of the disputed claim term or "intentionally disclaimed or disavowed claim scope." *Retractable Techs, Inc.*, 659 F.3d at 1371; *see also Thorner v. Sony Company Entertainment America LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) (Courts may not "read limitations from the specification into claims; [and] do not redefine words. Only the patentee can do that."); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) ("Claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate ... by redefining the term" [or by using in the specification] "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). Thus, the "longstanding difficulty is the contrasting nature of the axioms that (a) a claim must be read in view of the specification and (b) a court may not read a limitation into a claim from the specification." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,

381 F.3d 1111, 1117 (Fed. Cir. 2004); *see also Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language."). "[T]here is a fine line between reading a claim *in light of* the written description and reading a limitation into the claim from the written description." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1321 (Fed. Cir. 2016). (emphasis original)

"The words of a claim receive the meaning discernible by a person of ordinary skill in the art who has read the entire patent, including the specification, at the time of the invention." *SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1368 (Fed. Cir. 2010). The "circumstances in which the written description causes one of skill in the art to reject the plain meaning of a term are quite narrow." *Retractable Techs, Inc.*, 659 F.3d at 1371. If the inventor uses a "broad claim term that is not supported by his specification," a court may not "redefine a claim term to match [its understanding] of the scope of the invention as disclosed in the specification." *Id.* An inventor's use of a broad claim term unsupported by the specification may call the validity of the patent into question, but the specification only narrows and never enlarges the meaning of a term. *Id.*; *see also Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1373 (Fed. Cir. 2008) (stating that "the words of the claims define the scope of the patented invention"); *Phillips*, 415 F.3d. at 1316.

In construing a term, courts first consider sources of intrinsic evidence, such as the claim language, the specification, and, where in evidence, the prosecution history. *Id.* at

1317. Intrinsic evidence is the most significant source for determining the "legally operative meaning of disputed claim language." *Vitronics Corp.*, 90 F.3d at 1582.

If, after consideration of the intrinsic evidence, the meaning of a term remains ambiguous, a court may consider sources of extrinsic evidence, including dictionaries, treatises, and expert and inventor testimony. *Phillips*, 415 F.3d. at 1317-18. Although extrinsic evidence may prove useful in some cases, it is, for a variety of reasons, generally less persuasive than intrinsic evidence. *Id.* at 1318.

## PHOSITA QUALIFICATIONS

As a preliminary matter, the parties disagree about the requisite qualifications of a person having ordinary skill in the art (PHOSITA). Kokido contends that a PHOSITA is someone qualified in the field of vacuums generally and hand-held vacuums in particular. Kokido's expert, Adam Carr, has a bachelor's degree in industrial design, an MBA in design and innovation management, and 20 years' experience in industrial design, including many dry vacuum design patents.

Water Tech asserts that a PHOSITA must be qualified in the field of *water-submersible* vacuums, specifically, due to the unique challenges of water-proofing (of electronic elements) and fluid dynamics (for maneuverability). Water Tech's expert, David Peterson, has a bachelor's degree in civil engineering and additional education and training in engineering management and watershape construction. He is a licensed engineer with approximately 20 years' experience in watershaping, including several patents related to pools and pool cleaning devices. Kokido responds that this case

involves only the form of the products and not their function, so water expertise is unnecessary.

In its interrogatory answers, Water Tech described the qualifications of a PHOSITA as follows:

> The level of ordinary skill in the art is at least a bachelor's degree in either mechanical or electrical engineering and at least 3-5 years of experience in the research, design and commercialization of products in the field of art, or alternatively less formal education and at least 5-10 years of experience in the research, design and commercialization of products in the field of art.

(ECF No. 88-7, p. 21)

While there may be aspects especially of the '975 patent that address hydrodynamics, none of the claim terms at issue here require such expertise. The Court believes that an engineer or other professional with training or experience in hand-held vacuums would appreciate the similarities and differences between air and water vacuums in a manner sufficient to comprehend the patents. Therefore, with respect to the claim construction issues presented here, the Court finds that a PHOSITA need not possess particularized specialization with respect to water-submersible devices. Mr. Carr's experience with hand-held vacuums suffices. In any case, the Court relies little on either expert's testimony for purposes of claim construction. Water Tech remains free to challenge Mr. Carr's credibility in future proceedings if it becomes relevant.

**CONSTRUCTION OF DISPUTED CLAIMS**

**THE '460 PATENT**

**The '460 Patent, Claim 1**

Claim 1 of the '460 Patent claims (with disputed terms in bold):

1. A pool cleaning kit comprising:

a hand-held submersible electrically-powered pool cleaner including:

> a **nozzle**;

> a **toroidal body** having:

>> a carrying handle for carrying, manipulating, and directing the cleaner during use, with the **carrying handle being integrally formed from an upper portion of the toroidal body and an opening through the toroidal body**;

>> a rechargeable power source;

>> an impeller and drive motor powered by the rechargeable power source, and

>> a filter;

> wherein the **toroidal body** has an intake opening in fluid communication with the nozzle; and

> wherein the impeller draws pool water through the **nozzle** and filter to remove dirt and debris from the pool water; and

a charging device for charging the rechargeable power source.

Col. 5:55–6:8.

The parties request construction of the following terms:[1]

**1.**     *Nozzle*

The "nozzle" is referenced throughout the patent but is not precisely described or

identified by number in the specification. The abstract explains that the pool cleaner has

---

[1] Claim 12 involves the same disputed terms. The Court's construction of claim 1 terms applies equally to claim 12.

an "intake nozzle for suctioning pool water," a handle "for manipulating the nozzle over the surface of a pool," and a filter housing "disposed between the nozzle and the body." Col. 1:38-45. The patent does, however, identify a nozzle attachment (36) similar to vacuum hose attachments, a tubular member (44) to which such attachments fit, and a nozzle pivot interface (42), which allows the nozzle attachments to angulate. The tubular member is identified as 44 in Figure 3, illustrating the "nozzle end of the pool cleaner," and as 44 and 58 in Figure 4, illustrating a nozzle attachment.



*FIG.3*

*FIG.4*

Water Tech asserts that "nozzle" should be construed as "**a piece used to direct a flow or fluid.**"  Kokido proposes "**a short tube protruding from the pool cleaner used to direct a flow of fluid.**"  Water Tech objects to Kokido's construction insofar as the patent does not specify length, require protrusion, or reference a tube.  The Court agrees that the patent does not invite inferences of length or protrusion.  While these limitations appear to be part of the preferred embodiment and are illustrated by the figures, they are not suggested by the claim language itself or the description.  As such, there is no basis for importing these limitations into this term.  *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 345 F.3d 1318, 1327 (Fed. Cir. 2003) (declining to restrict the meaning of a claim term based on the description).

However, though the patent does not require any particular shape of nozzle attachment, the figures depict a nozzle end that is tubular and, throughout the specification, both the nozzle end and the nozzle attachments include a tubular member.  For example:

> The nozzle pivot interface **42** includes a tubular member **44** to which a particular selected nozzle attachment **36** is removably secured ... .  In one embodiment, the nozzle pivot interface **42** has a predetermined width for attachment to standard, commercially available nozzle attachments such as components with widths of about one inch (about 2.5 cm). Col. 3:55-62.

Indeed, nothing but a tubular nozzle is described or illustrated in either the description or any of the embodiments discussed in the patent.  The Court therefore finds that the nozzle is tubular.  *See Howmedica*, 822 F.3d at 1321 (noting that "every description and every figure in the patent that discusses the issue" compelled the same construction).  Though the Court need not rely on the extrinsic evidence to reach this

conclusion, the Court also notes that both parties' dictionary definitions refer to a tube.[2]

Thus, the Court concludes that "**nozzle**" shall be defined as "**a tube directing a flow of fluid**."

### 2. *Body*

Water Tech asserts that "body" needs no construction and should be given its plain and ordinary meaning. Kokido proposes: "**the main outer casing of the pool cleaner.**"

The intrinsic evidence belies Kokido's narrow interpretation. The specification reflects that "body" (16) refers to the rear section of the device as a whole.

> Abstract: The body has a filter, and impeller and motor, rechargeable batteries, and a handle for carrying the body and for maneuvering the nozzle along the surface being cleaned.

> Summary: The body houses a filter, an impeller attached to an electric motor, and includes a handle for carrying the body." A filter housing disposed between the nozzle and the body accumulates the filtered debris." Col. 1:39-41, 1:44-46.

> The body 16 includes hollow sections 18 … which fill with water during immersion so the pool clearner 10 is not buoyant after fall [sic] immersion. Col. 2:56-59.

> A pole attachment member 20 extends from the body 16 allowing the extended pole 12 to be securely but removably attached to the pool cleaner 10 … . Col. 2:63-65.

---

[2] Water Tech offers a dictionary definition of nozzle as "a contracting, tapering tube or vent used at the end of a pipe, tube, or hose to accelerate or direct the flow of a liquid." Academic Press Dictionary of Science and Technology, Christopher Morris ed., 1992. Kokido offers the definition: "a short tube with a taper or constriction used (as on a hose) to speed up or direct a flow of fluid. Nozzle." Merriam-Webster.com. Accessed April 20, 2018. https://www.merriam-webster.com/dictionary/nozzle.

Perhaps most compelling, Figures 8 and 9 represent "cross-sectional view[s] of the body of the pool cleaner" and illustrate the entire rear section of the device, including its internal components. Figure 9 is most representative:



FIG.9

Thus Kokido's construction of "body" as meaning only the outer casing simply does not comport with the intrinsic evidence. "The words of a claim receive the meaning discernible by a person of ordinary skill in the art who has read the entire patent, including the specification, at the time of the invention." *SEB S.A.,* 594 F.3d at 1368. The Court finds that, after reading the entire patent, a PHOSITA would understand "body" without the need for further construction. The Court rejects Kokido's narrow definition and declines to construe "body" away from its plain and ordinary meaning.

### 3.    *Toroidal body*

The parties agree that a toroid is a three-dimensional shape formed by rotating a two-dimensional shape about an axis. For example, a two-dimensional letter "O" (a circle) rotated about an axis forms a three-dimensional donut, i.e., a toroid. A two-dimensional rectangle rotated about its axis forms a cylinder. Kokido asserts that

"toroidal" is simply the adjective form of toroid and thus should be construed to mean a complete and symmetrical toroid. Kokido therefore proposes the construction: "**a body that is shaped like a toroid and 360° symmetrical.**" Water Tech asserts that "toroidal" is broader and does not imply a perfect toroid; in fact, the patent figures preclude such a construction. Water Tech proposes: "**a body having a shape generally related to a toroid.**"

The intrinsic evidence suggests a broad construction. Terms in a patent document are construed with the meaning with which they are presented in the patent document. *Phillips*, 415 F.3d at 1316. "The context in which a term is used in the asserted claim can be highly instructive." *Id.* at 1314. Here, the context of Claim 1 instructs that an opening in the *upper portion* of the toroidal body creates a handle. This implies that the body is asymmetrical.

The specification is the best guide to the meaning of a disputed term. *Id.* at 1315. Notably, patent Figures 2, 8, 9, and 11 do not depict a perfect toroid but rather a curved body with a hole in the top. Figure 2 shown below is representative, and Kokido concedes that its definition excludes this preferred embodiment. (Tr. 150) A proposed construction that does not include a preferred embodiment is rarely, if ever, correct. *SanDisk Corp. V. Memorex Prod., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005).



FIG.2

Though the word "toroidal" appears only in the claims and not expressly in the specification, the latter nonetheless implies a generalization of the term. Referring to the "side elevational view" of the device (Fig. 2), the narrative describes a body with "an ergonometric streamlined shape, e.g., a smooth and curvilinear surface providing low resistance in the water." Col. 2:51-53. In this respect, the specification reveals a meaning that contradicts the narrow definition proposed by Kokido.

The prosecution history is consistent with the specification in this regard. "The prosecution history has value because it provides evidence of how the PTO and the inventor understood the patent." *FPS Investments, LLC v. Azteca Mill*, L.P., 553 F.Supp.2d 1120, 1124 (E.D. Mo. 2008). Here, the inventor filed an amendment[3] adding

_____

[3] This amendment was also sought for the precursor to the '460, namely U.S. Patent 6,797,157 (the '157).

- 14 -

"toroidal" to describe the body of the '460 in order to distinguish it from another pool cleaner, known as the Schuman model,[4] which has a straight, elongated, cylindrical body.



**Schuman**                    **'460**

Although a cylinder is a type of toroid, the Schuman patent does not contain the words toroid or toroidal; rather, the Schuman patent refers to the Schuman device as cylindrical. Thus, in the '460 amendment application, the '460 inventor asserted that Schuman "does not have a toroidal body" and explained that the '460's toroidal body, with a carrying handle formed from an opening in the body, "is more advantageous, since it is easier to grasp as a handle," causes "little or no strain to the hands of the user," "allows the pool cleaner to have a more compact shape … so the claimed invention is more maneuverable," and, due to the toroidal shape of its body, is "less susceptible to water currents." ECF No. 88-10. This explanation further illuminates the meaning of the specification describing a curvilinear body for low resistance. Correctly or incorrectly, the patent examiner allowed the inventor's amendment, reasoning that, although Schuman did have a toroidal body (presumably because a cylinder is a toroid), Schuman

---

[4] U.S. Patent No. 4,962,559.

failed to teach a toroidal body having a carrying handle formed by an opening through the toroidal body for carrying, manipulating, and directing the cleaner. ECF No. 88-20.

The foregoing evidence intrinsic to the '460 – the claim, specification, and prosecution history – supports a conclusion that the inventor envisioned a curved, compact body with a hole through it for a handle, but not a perfect toroid. In other words, if Figures 2 and 9 reflect what the inventor and examiner viewed as a toroidal body, then Kokido's construction invoking 360-degree symmetry cannot be correct.

Nevertheless, Kokido contends that the foregoing intrinsic evidence provides no guidance. Instead, Kokido points to U.S. Patent No. 4,624,274, issued November 25, 1986 (the Norton patent), describing another cylindrical pool cleaner as having a "toroidal shaped housing." Norton is not disclosed as prior art in the '460 but rather in the '460's successor, specifically U.S. Patent No. 7,060,182, issued June 13, 2006 (the '182). But Kokido fails to supply authority for its proposition that a child's prior art carries the weight of intrinsic evidence as to the parent. Rather, Kokido principally argues that, because terms should be construed consistently within a patent family (*Paice LLC v. Ford Motor Company*, 881 F.3d 894, 904 (Fed. Cir. 2018)), and because Norton's version of toroidal (i.e., cylindrical) is prior art in the '182, then Norton's version should "relate back" to the '460. This argument is unpersuasive. There is no dispute that Schuman and Norton are cylinders. While both the '182 and '460 *contain* cylinders, it cannot be said that their embodiments resemble Schuman or Norton cylinders. Like the '460, the prosecution history of the '182 states that the prior art fails to teach a toroidal

body with a carrying handle formed from the upper portion of the toroidal body. Again, this description precludes a construction requiring 360-degree symmetry.

Looking beyond the patent itself, the Court finds minimal value in the extrinsic evidence presented on this issue. Expert opinions can be unreliable because they are generated during litigation. *FPS Investments*, 553 F.Supp.2d at 1124. Water Tech's expert essentially testified that anything with a curve and a hole is toroidal; Mr. Peterson was not credible in this regard. "Unsupported … assertions as to the definition of a claim term are not useful to a court." *Phillips*, 415 F.3d at 1318. As such, the Court rejects Mr. Peterson's testimony concerning "toroidal." Inversely, Kokido's expert opined that a PHOSITA would understand "toroidal" to describe a 360-degree symmetrical toroid. But a "court should discount any expert testimony that is clearly at odds with the intrinsic evidence." *Id.* Here, Mr. Carr's opinion is clearly at odds with the intrinsic evidence. In short, the expert testimony is unhelpful.

As additional extrinsic evidence, Water Tech offered four unrelated patents using "toroidal" to describe the shape of other objects, namely sunglasses, a tire, a watch face, and a magnet.[5] The sunglasses curve around the eyes to create a partial circle; the others form a complete donut or cylinder. The Court gives little weight to this evidence, which only underscores the variation in usage. *See e.g., Elan Microelectronics Corp. v. Pixcir Microelectronics Co. Ltd.*, 2:10-CV-00014-GMN, 2013 WL 2394358, at *19 (D. Nev. May 30, 2013) (noting that an "unrelated patent carries much less persuasive weight than

_____

[5] Water Tech offered these patents as Exhibits 13-16 attached to their responsive brief. ECF Nos. 108-4, -5, -6, -7. Kokido moved to strike the exhibits as untimely (ECF No. 110) but withdrew its objection during the Markman hearing. Tr. 151.

the specification" and should not be used to vary the definition from the usage in the specification).

Finally, a court may rely on a dictionary definition so long as that definition does not contradict the meaning ascertained by a reading of the patent documents. *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). The suffix "-al" generally means "of, relating to, or characterized by." *See e.g., Civix-DDI, LLC v. Cellco Partnership*, 03 C 3792, 2005 WL 831307, at *4 (N.D. Ill. Apr. 6, 2005) (citing Webster's 3rd New Int'l Dictionary).[6] Kokido provides a dictionary definition of toroidal as: "of, relating to, or shaped like a torus or toroid; doughnut-shaped."[7] This definition contains aspects of each party's constructions insofar as Water Tech invokes "related to" and Kokido invokes "shaped like." But Kokido's construction requiring a perfect toroid clearly contradicts any meaning ascertainable by a reading of the patent documents, so it cannot apply.

In sum, while the intrinsic evidence lends substantial breadth to the word "toroidal,"[8] that same evidence also precludes Kokido's narrow definition. Thus, upon

---

[6] *See also* "-Al." Merriam-Webster.com. Accessed March 5, 2019. https://www.merriam-webster.com/dictionary/Al

[7] "Toroidal." Merriam-Webster.com. Accessed April 20, 2018. https://www.merriam-webster.com/dictionary/toroidal.

[8] A "patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901, 134 S. Ct. 2120, 2124, 189 L. Ed. 2d 37 (2014). The Court expresses no opinion on indefiniteness at this stage.

consideration of the intrinsic and extrinsic evidence, the Court concludes that "**toroidal body**" shall be defined as "**a body having a shape related to a toroid**."

> **4.** *Carrying handle being integrally formed from an upper portion of the toroidal body and an opening through the toroidal body*

For this term, Water Tech proposes: "**carrying handle being formed as a single unit with the body at a portion of the body that is on a different axis than the axis of the body and defining a space between the body handle and the body.**" In its brief, Water Tech dissects the claim into separate parts: distinguishing "integrally formed" (as a single unit) from "integrally molded;" distinguishing the axis of the body from the axis of the handle; and asserting that the handle need not be closed but could also be open (like a hook or a letter "C" rather than a loop or letter "O"). Using this definition, Water Tech contends that the pole attachment member (20) could serve as a carrying handle if the user holds the device upside-down.

Kokido advocates a simpler construction describing in words what Figure 2 depicts by illustration: "**an integral handle formed from the upper portion of the body by an opening through the body, i.e., the opening through the body creates the handle from the upper portion of the body.**"

The intrinsic evidence favors Kokido's construction. Most compellingly, Figures 2, 8, 9, and 11 identify the handle in question as number 14 (see Figure 2 above), created by the hole through the top of the body when right-side up. The pole attachment member (20) extends from underneath the device to hold an extension pole. The written description confirms these distinct functions. For example, in its "hand-held mode of

operation, the pool cleaner includes an integral handle 14, allowing the user immersed with the pool cleaner 10 in the pool to grasp and orient the pool cleaner 10 and so to manipulate the pool cleaner over the surfaces." Col. 2:44-48. By contrast, the "pole attachment member 20 extends from the body 16 allowing the extended pole 12 to be securely but removably attached to the pool cleaner" for use while standing outside the pool. Col. 2:63-66. The specification further states that the pool cleaner "responds primarily to the movement determined by the user by *use of the handle* 14 *or the pole* 12 when attached to the pole attachment member 20." Col. 3:17-20. (emphasis added) These excerpts make clear that the handle (14) and pole attachment member (20) are different things. Neither the figures nor the written description of the specification invite a reasonable inference that the inventor sought to optimize hand-held maneuverability by use of the pole attachment member as a handle.

Water Tech's construction is unnecessarily convoluted and unsupported by the specification. Kokido does not dispute that "integrally formed" is different than "integrally molded." Other courts have defined "integrally formed" to include an assembled unit. The Federal Circuit instructs that "integral" can encompass "more than a unitary construction." *In re Morris*, 127 F.3d 1048, 1055 (Fed. Cir. 1997). But, again, claim terms must be construed in the context of the entire patent. *Trustees of Columbia Univ. in City of New York*, 811 F.3d at 1362. Water Tech's suggestion that the '460's handle can be assembled with the body, so as to qualify the pole attachment member as a handle, does not comport with the intrinsic evidence demonstrating that the handle is formed from an opening *through* the body.

Water Tech's focus on different axes is similarly flawed. By Water Tech's definition, the handle could be anywhere so long as it is not aligned with the axis of the battery housing. Water Tech goes so far as to assert that "the term 'upper' is relative" because the cleaner can be held *upside down*. This very reasoning confirms that the device has an intended orientation, as shown in the figures. Taken to its logical extreme, Water Tech's theory of relativity negates all patent references to orientation and perspective. In the very least, it renders the claim term "upper" superfluous. "A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so." *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005).

Equally unpersuasive is Water Tech's contention that the handle, shown in the patent figures as a closed loop or hole, could also be open like a hook - hence the phrase "defining a space between the body handle and the body." The intrinsic evidence consistently describes a handle formed by an *opening through* the body. "Space between" is not an accurate substitute, and, again, Water Tech's attempt to capture the pole attachment member within the definition of the handle is unavailing. The Court does not believe that a PHOSITA would read the entire patent and conclude that the carrying handle described therein could be understood to include the pole attachment member, or that the words "formed from … an opening through the toroidal body" would include a hook.

"The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct

construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d at 1250. The "interpretation to be given a term can only be determined with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Id.*

Kokido's proposal offers a natural reading supported by the claim language and specification. Accordingly, the Court adopts the construction: "**an integral handle formed from the upper portion of the body by an opening through the body, i.e., the opening through the body creates the handle from the upper portion of the body**."

### The '460 Patent, Claim 6

Dependent Claim 6 of the '460 Patent claims:

The pool cleaning kit of claim 1, **wherein the nozzle of the pool cleaner is pivotable**.

Col. 6:27–28.

Water Tech asserts that no construction is necessary; the term can be given its plain and ordinary meaning. Kokido proposes: "**the nozzle can pivot with respect to the body.**" Kokido's entire argument on this term consists of two sentences stating that (1) "pivotable" is not defined in the '460 and (2) a PHOSITA would assign Kokido's proposed meaning. This provides scant reason for the Court to intervene. Kokido fails to articulate how the claim is ambiguous absent the qualifier "with respect to the body." In fact, the qualifier only injects confusion because the nozzle pivot interface is actually attached to the filter housing (26) and not the body (16), as Kokido will recognize in Claim 7.

Figures 2, 3, and 11 illustrate the assembly and mobility of this aspect of the device. Consistent with the images, the description explains:

> The flexible bellows **38** is disposed between the nozzle pivot interface **42** and the filter housing **26**, allowing the nozzle pivot interface **42** and the nozzle attachment **36** mounted thereto to pivot about the circular pegs **46** and so permitting the pool cleaner **10** to be easily manipulated over and around curved surfaces in the pool." Col. 3:52-Col. 4:3.

In other words, the nozzle pivot interface enables the nozzle attachment to angulate so as to maintain contact with the surface being cleaned. Additionally, Kokido's own expert, Mr. Carr, stated in his declaration that a PHOSITA would construe the term "pivotable" to have its plain and ordinary meaning. (Carr declaration ¶142.)

Kokido's construction injects ambiguity where none exists. Construction of the claim is unnecessary because the plain and ordinary meaning suffices.

### The '460 Patent, Claim 7

Dependent Claim 7 of the '460 Patent claims:

The pool cleaning kit of claim 1, wherein the pool cleaner further includes:

> a **filter housing disposed between the nozzle and the body for accumulating the filtered debris.**

Col. 6:29–32.

Water Tech asserts that no construction is necessary because a PHOSITA would understand the plain and ordinary meaning of the claim language. Kokido splits the phrase into two parts. Kokido proposes that "filter housing" be defined as "**a structure separate and distinct from the body and nozzle that contains the filter in which debris is accumulated**." From there, Kokido proposes that the full phrase be defined as

- 23 -

"**a structure containing a filter and the filter housing is separate and distinct from the body.**"  Again here, Kokido fails to convince the Court that construction is warranted.

The claim itself already distinguishes the filter housing from the nozzle and body by stating that the filter housing is disposed (i.e., positioned) between the nozzle and the body.  It is also obvious from the plain and ordinary meaning of the claim, read in its entirety, that the filter housing contains (i.e., houses) a filter in which debris is accumulated.  Additionally, Kokido's expert declared that a PHOSITA would construe the term "filter housing" to have its plain and ordinary meaning.  (Carr declaration ¶146.) A court need not engage in claim construction merely to accommodate one party's preference for the use of a particular word or phrase.  *O2 Micro*, 521 F.3d at 1361-62. The Court finds construction unnecessary here.

# THE '975 PATENT

## The '975 Patent, Claim 12

Claim 12 of the '975 Patent claims:

A pool vacuum comprising:

a rear body housing;

a battery supported by said rear body housing;

a motor supported by said rear body housing and electrically connected to said battery;

an output, shaft drivably connected to said motor and extending out of said rear body housing;

**a front housing section affixed to said rear body housing and defining a gap between said rear body housing and said front housing section**; and

an impeller attached to said output shaft and rotatable at least partially within said **gap** to pull water through an opening of said **front housing section** and expel water through said **gap**;

**an expanded skeletal structure attached to said rear body housing** and extending into said **front housing section** and including structural support members having interstitial water passages; and

an area of filter material supported by said **expanded skeletal structure** and covering said interstitial water passages to filter water passing through said interstitial water passages.

Col. 12:58–13:12



FIG 2

FIG 3

The parties request construction of the following terms:

**1.** *Gap*

Water Tech asserts that "gap" does not require construction and should be given its plain and ordinary meaning. Kokido proposes: "**an unfilled open space between two separate objects.**" Specification figures show a space (75) between the front housing

section (25) and rear body housing (23), separating those two parts of the device. Kokido offers a dictionary definition describing a gap as "a separation in space"[9] and Mr. Carr's testimony endorsing its proposed construction.

"Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention." *O2 Micro*, 521 F.3d at 1360. "In some cases, the ordinary meaning of claim language "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* Such is the case here. The plain and ordinary meaning of "gap" is readily apparent even to this Court. Construction is unnecessary.

### 2. *Front housing section*

For "front housing section," Water Tech proposes: "**a front portion of the housing having one or more parts.**" Kokido proposes: "**a housing located at the forward portion of the vacuum.**"

The parties agree generally that "front housing section" identifies the front portion of the device and distinguishes it from the back of the device, called the "rear body housing." Consistent with this understanding, the specification explains:

> The construction of the pool vacuum **21** is somewhat modular with the rear body housing **23** including the mechanics and structural connections, while the nose-cone shaped front housing section **25** includes a filter cone and water inlet. Water is expelled from a narrow space between the rear body

---

[9] "Gap." Merriam-Webster.com Accessed April 20, 2018. https://www.merriam-webster.com/dictionary/gap.

housing **23** and a nose-cone shaped front housing section **25**, as will be described. Col. 2:63-3:2.

Similarly, Figures 1-5 identify the front housing section (25) and rear body housing (23) generally as the front and back portions of the device, as illustrated above in Figure 3. The parties also agree that the front housing section comprises other components (Fig. 3), including a housing member (Fig. 2-3, 79) that serves as a shell around the internal elements of the front section. As external evidence, Water Tech offers a dictionary definition defining "section" as "a distinct part of a larger whole."[10]

Water Tech argues that Kokido's definition is imprecise because it equates the front and back *housings*, whereas the inventor chose to use the broader term "section" for the front. Indeed, in the absence of evidence to the contrary, the Court must presume that the use of different terms connotes different meanings. *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1318 (Fed. Cir. 2000). Consistent with this principle, the Court agrees with both parties that the "front housing section" is more than just the housing (i.e., shell, casing). Thus, neither party's definition specifying the housing is accurate. Rather, "front housing section" simply identifies the front part (i.e., portion, half) of the device, including the housing member and components therein, as distinct from the rear body housing. As such, the Court rejects the parties' constructions and instead construes "**front housing section**" to mean the "**front section of the pool cleaner, including a housing containing one or more parts**."

---

[10] Academic Press Dictionary of Science and Technology, Christopher Morris ed. 1992).

**3.** *A front housing section affixed to said rear body housing and defining a gap between said rear body housing and said front housing section*

For this phrase, Water Tech proposes: "**a space formed at or near an end of the rear body housing or an end of the front housing section or both.**" Kokido proposes: "**when the front enclosure is attached to the rear enclosure, an unfilled open space is formed between the end of the front housing and the rear housing.**"

Again, Figures 2 and 3 illustrate the configuration. The front and rear sections of the device connect by way of fittings (61, 69) and spacers (67) that leave a narrow space (described in one place as "about one quarter of an inch" Col. 8:33-34) in between the two sections (i.e., the gap (75)) for water expulsion. The specification describes several variations:

> The rear body housing **23** has a series of four angled fittings **61**, each having a linear cutout **63** for admitting a bolt **65**. Just forward of the four angled fittings **61**, a spacer **67** sets the separation between the four angled fittings **61** of the rear body housing **23** and a series of four filter cone housing fittings **69** which are attached to or formed integrally with a cone plate **71**. The spacers **67** can be formed integrally with either the four angled fittings **61** or the series of four filter cone housing fittings **69**. Where the spacers **67** are formed integrally with the four angled fittings **61** the extent of the forward most extent of the rear body housing **23** will be extended forward, and where the spacers **67** are formed integrally with the series of four filter cone housing fittings **69** the rearward extent of the nose-cone shaped front housing section will be extended rearwardly. …

> In either of these three cases, a gap **75** may be formed completely about the connection of the rear body housing **23** with the nose-cone shaped front housing section **25**, interrupted only by the existence of the periodically appearing four angled fittings **61**, spacers **67** and series of four filter cone housing fittings **69**, or the gap may exist on the upper side and two lateral sides with the bottom gap covered by an interfering plate or obstruction. Col. 3:46-4:5.

To simplify, Water Tech explains that the spacers can be attached to the rear portion of the device extending forward, or to the front section extending backward, or neither. Based on these variations, Water Tech claims that the gap may be positioned at the front of the rear portion, or at the back of the front section, or both, depending on the placement of the spacers. Kokido responds that such a characterization is absurd; there is only one gap, formed by spacers between the front and back sections, regardless of which part holds them in place.

The Court agrees with Kokido that the gap need not be attributed to either section of the device, as Water Tech advocates. The claim language itself is clear in this respect: the affixing of the front housing section to the rear body housing *defines* a gap between the two. The specification, too, belies Water Tech's characterization.

> Abstract: An *interstitial open* exhaust gap between a rear body and front nose-cone section provides a low pressure drop free exhaust area for an impeller. Col. 1:59-61. (emphasis added)

> Description: One aspect of the even placement of the angled fittings **61**, spacers **67** and series of four filter cone housing fittings **69** is that the gaps **73** which open circumferentially around the periphery of the pool vacuum **21** at the junction between the rear body housing **23** and the nose-cone shaped front housing section **25** form an even filtered water exhaust. Col. 4:11-16.

> Also seen are the spacers **67** which help identify and control the width of the gap. Col. 8:30-31.

Put simply, the gap is located at and created by the junction between the two sections. Thus, Water Tech's definition is not acceptable. However, Kokido's definition is also flawed insofar as it injects the new and undefined term "enclosure" and contains the redundant adjective "unfilled" already inherent in the concept of a gap or space.

The Court finds that the proper construction is: "**a front housing section**[11] **that is affixed to the rear body housing in a manner that creates an open gap between the front housing section and the rear body housing**."

### 4.    *An expanded skeletal structure*

For this claim term, Kokido proposes: "**a framework of supporting members that increases in size and opens wide at an end.**"   In support of its proposed construction, Kokido offers dictionary definitions of expand (to open out, to spread),[12] skeleton (something forming a structural framework),[13] and skeletal (of, relating to, forming, attached to, or resembling a skeleton),[14] and the affirmation of Mr. Carr.

Water Tech contends that that a PHOSITA would readily understand the phrase "expanded skeletal structure" such that the plain and ordinary meaning suffices.   At the same time, however, Water Tech objects to Kokido's limitations "increases in size" and "opens wide at an end."   Clearly, the parties dispute what "an expanded skeletal structure" means.   "[W]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."   *O2 Micro*, 521 F.3d at 1361-62.

Here, the claim language describes the skeletal structure as follows:

> **an expanded skeletal structure** attached to said rear body housing and extending into said front housing section and including structural support members having interstitial water passages; and

---

[11] As construed *supra*.

[12] "Expand."  Merriam-Webster.com. Accessed April 18, 2018.  https://www.merriam-webster.com/dictionary/expand.

[13] "Skeleton."  Merriam-Webster.com. Accessed April 18, 2018.  https://www.merriam-webster.com/dictionary/skeleton.

[14] "Skeletal."  Merriam-Webster.com. Accessed April 18, 2018.  https://www.merriam-webster.com/dictionary/skeletal.

an area of filter material supported by said **expanded skeletal structure** and covering said interstitial water passages to filter water passing through said interstitial water passages. Col 13:5-12.

In the specification, the expanded skeletal structure is illustrated in Figure 3 (99), showing an expanding support framework. The written specification further explains: "As can be seen, the cone plate 71 supports an expanded skeletal structure 99 which includes longitudinal ribs 101 periodically connected to a series of ring supports 103." Col. 5:67-6:3.

Thus, the "skeletal structure" is "a skeletal framework including structural support members." As for "expanded," while the front housing section in Claim 12 is not necessarily limited to the nose-cone-shaped housing described in Claim 1 and in the preferred embodiments, in light of the specification, "expanded" indicates "wider at one end." Therefore, the Court concludes that "**an expanded skeletal structure**" means "**a skeletal framework, including structural support members, that expands to be wider at one end**."

5.     *Attached to said rear body housing*

Water Tech maintains that "attached to said rear body housing" needs no construction and should be given its plain and ordinary meaning. Kokido proposes: "**fastened or joined directly to the rear body housing.**" Centrally, the parties dispute whether the expanded skeletal structure must be attached *directly* to the rear body housing or instead may be attached *indirectly* through other elements.

A review of the patent as a whole reveals two important factors related to this issue. First, while Claim 1 and Claim 10 both disclose a cone plate attached to the rear

body housing, neither claim discloses an expanded skeletal structure attached to the rear body housing and extending into the front housing section. Rather, that element is disclosed only in Claim 12 and dependent Claim 13. Claims 1 and 10 disclose only "a filter cone housing member" attached to said cone plate. And Claim 12 does not disclose a cone plate but instead simply discloses that the expanded skeletal structure is "attached" to the rear body housing. However, the figures illustrate, and the preferred embodiment discusses, an expanded skeletal structure that is attached to a cone plate, which is, in turn, affixed to the rear body housing. The written specification states in pertinent part:

> As can be seen, the cone plate **71** supports an expanded skeletal structure **99** … . Col. 5:67-6:1.

> Generally speaking, [the] cone plate **71** provides the most significant structural connection of the nose-cone shaped front housing section **25** onto the rear body housing **23**. In some cases, other structural components of the nose-cone shaped front housing section can be attached either permanently or temporarily to the rear body housing **23**, but the technique of dependence of the other components of the nose-cone shaped front housing section **25** onto the cone plate **71** makes for some additional simplicity of construction and operation. Col 4:28-36.

> As has been explained, the cone plate **71** is attached to the rear body housing **23** with the use of four angled fittings **61** and four filter cone housing fittings **69** with the possibility of an optional spacer **67** … . Col. 4:43-46.

These excerpts together indicate that, in one and perhaps the preferred embodiment, the expanded skeletal structure is attached to the cone plate, which is attached to the rear body housing by way of the fittings. Figure 3 illustrates such an assembly (99, 71, 61, 69, 23). So, Kokido's proposed construction requiring direct

attachment of the skeletal structure to the housing conflicts with the specification and thus cannot be correct.

Further support for this conclusion is found in the fact that, discussing the filter cone housing and the cone plate, the claim language uses the word "attached," but in discussing the front housing section and the rear body housing, the claims use the word "affixed." Claim terms must be construed in the context of the entire patent. *Trustees of Columbia Univ. in City of New York*, 811 F.3d at 1362. Viewing the patent in its entirety, a PHOSITA would understand that "attached" in this context includes direct and indirect attachment. Thus, the Court construes "**attached**" **to include direct and indirect attachment**.

### The '975 Patent, Claim 13

Dependent Claim 13 of the '975 Patent claims:

The pool vacuum as recited in claim 12 and wherein **said expanded skeletal structure has an opening not covered by said area of filter material and further comprising:**

**a drainage valve having an input in communication with said opening of said skeletal structure, and an output, for draining filtered water from within said expanded skeletal structure.**

Col. 13:13–19.

Water Tech contends that this claim does not require construction and should be given its plain and ordinary meaning. Kokido proposes: "**the drainage valve is located**

**in an opening above the frustum**[15] **of the expanded skeletal structure in a portion not covered by filter material.**"

Figure 3 shows the valve (85) at the end of an extension structure (113) not covered by filter material. The specification explains:

> The poppet valve element **85** is placed in a position with surrounding structures to form sealing closure of the forward most ring support **103**. […] An extension structure **113** beyond the forward most ring support **103** provides a short easy travel for the poppet valve element **85**. When the poppet valve element **85** slides forward and out between any structural element which holds the poppet valve element **85** inside the poppet valve opening **87**, the circumferential spaces between any structural element which holds the poppet valve element **85** inside the poppet valve opening **87** forms a drainage path of any water otherwise trapped inside the expanded skeletal structure. Col. 6:51-63.

In support of its construction, Kokido simply asserts, without elaboration, that a PHOSITA would understand the claim in question to mean what Kokido proposes. Water Tech counters that Kokido's definition attempts to limit the claim scope, when the actual language "in communication with" does not specify positioning but merely describes the relationship between the valve and the opening. The Court agrees that Kokido's definition adds an unnecessary restriction. A claim should not be limited by the preferred embodiment. *Phillips*, 415 F.3d at 1323. Apart from Kokido's attempt to restrict the claim language, the parties do not appear to have any real dispute with respect to the claim language. A court need not construe a term where the parties do not present a fundamental dispute with respect to the meaning of the term but instead propose the use of different language to achieve greater clarity or precision. *O2 Micro*, 521 F.3d at 1362.

---

[15] A frustrum is the remainder of a cone after its tip has been cut off.

Kokido fails to convince the Court of a fundamental dispute over the meaning of this claim, and the Court agrees with Water Tech that the plain and ordinary meaning suffices.

## THE 'D396 DESIGN PATENT

The 'D396 design patent claims "the ornamental design for a pool vacuum" as shown in the figures.



Kokido urges the Court to construe this claim as requiring opaque surfaces. In support, Kokido cites §1503.02.II of the Manual of Patent Examining Procedure (MPEP) stating: "Oblique line shading must be used to show transparent, translucent and highly polished or reflective surfaces, such as a mirror." In response, Water Tech contends that MPEP §1503.02 only requires oblique line shading when the inventor intends to limit the claim to a transparent surface; given that the 'D396 does not specify whether the exterior is opaque or transparent, both embodiments are included in its scope.

Water Tech's position is supported by the MPEP and the reasoning of another district court. MPEP §1503.02 states: "While surface shading is *not required* under 37 CFR 1.152, it *may* be necessary in particular cases to shade the figures to show clearly the character and contour of all surfaces of any 3-dimensional aspects of the design." MPEP §1503.02. (emphasis added) "The mandatory language does not necessarily mean that lack of oblique line shading disclaims a transparent … surface, nor does the lack of oblique line shading mean that the patentee only claimed an opaque surface." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 11-CV-01846-LHK, 2012 WL 3071477, at *5 (N.D. Cal. July 27, 2012). The MPEP "only specifies that an inventor wishing to limit a particular surface to a transparent … material must indicate the surface through the use of oblique lines. It does not state that failure to include oblique lines necessarily excludes the use of a transparent surface." *Id.* This Court agrees with that conclusion.

Kokido further argues that the 'D396 necessarily claims an opaque housing because it relates to the '975 utility patent, and Figures 2 and 3 of the '975 (see above) suggest that the filter cone housing member (79) is opaque. Specifically, Figure 3 mirrors Figure 2 "but with a portion of the filter cone housing member removed to expose an expanded skeletal structure covered with filter material." Col. 2:16-18. But Kokido offers no authority for its proposition that the '975 dictates construction of the 'D396, and it is not intrinsic evidence. "Design patents have almost no scope and are limited to what is shown in the application drawings." *FPS Investments*, 553 F. Supp. 2d at 1130. In construing a design patent, the "scope of the claimed design encompasses its visual appearance as a whole." *Id.*

Viewing the design drawings within the foregoing framework, the Court concludes that the scope of the 'D396 patent is not limited to contemplate only an opaque housing. The Court therefore adopts Water Tech's construction.

## CONCLUSION

**IT IS HEREBY ORDERED** that the parties' motions for claim construction are **GRANTED in part** and **DENIED in part** as set forth below.

1) With respect to the '460 patent:

   a) "**Nozzle**" shall be defined as "**a tube directing a flow of fluid**."

   b) The plain and ordinary meaning of "**body**" as understood by a PHOSITA is not ambiguous and requires no construction.

   c) "**Toroidal body**" shall be defined as "**a body having a shape related to a toroid**."

   d) "**Carrying handle being integrally formed from an upper portion of the toroidal body and an opening through the toroidal body**" shall be defined as "**an integral handle formed from the upper portion of the body by an opening through the body, i.e., the opening through the body creates the handle from the upper portion of the body**."

   e) The plain and ordinary meaning of "**wherein the nozzle of the pool cleaner is pivotable**" as understood by a PHOSITA is not ambiguous and requires no construction.

f) The plain and ordinary meaning of "**a filter housing disposed between the nozzle and the body for accumulating the filtered debris**" as understood by a PHOSITA is not ambiguous and requires no construction.

2) With respect to the '975 patent:

a) The plain and ordinary meaning of "**gap**" as understood by a PHOSITA is not ambiguous and requires no construction.

b) The "**front housing section**" shall be defined as the "**front section of the pool cleaner, including a housing containing one or more parts**."

c) "**A front housing section affixed to said rear body housing and defining a gap between said rear body housing and said front housing section**" shall be defined as "**a front housing section that is affixed to the rear body housing in a manner that creates an open gap between the front housing section and the rear body housing**."

d) "**Expanded skeletal structure**" shall be defined as "**a skeletal framework, including structural support members, that expands to be wider at one end**."

e) "A**ttached to said rear body housing**" shall be construed to **include direct and indirect attachment**.

f) The plain and ordinary meaning of "**said expanded skeletal structure has an opening not covered by said area of filter material and further comprising: a drainage valve having an input in communication with said opening of said skeletal structure, and an output, for draining filtered water from within said**

**expanded skeletal structure**" as understood by a PHOSITA is not ambiguous and requires no construction.

3) The 'D396 design patent shall be construed to encompass both opaque and transparent surfaces.

    **IT IS FURTHER ORDERED** that Kokido's motion to strike exhibits 13-16 attached to Water Tech's responsive brief (ECF Nos. 108-4. -5, -6, -7) is **DENIED as moot**. ECF No. 110.

 

                      *Audrey G. Fleissig*
                      AUDREY G. FLEISSIG
                      UNITED STATES DISTRICT JUDGE

Dated this 15th day of March, 2019.